UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| LOUISE M. REGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 08-CV-175-B-H |
| | ) | |
| SCHOOL ADMINISTRATIVE | ) | |
| DISTRICT 63, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDED DECISION ON MOTION
FOR SUMMARY JUDGMENT
AND CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Louise M. Regan commenced this civil action against School Administration District 63 and five members of the District's school board, seeking reinstatement to her position as the District's superintendent, among other remedies, based on alleged violations of her civil rights and certain state laws pertaining to public right of access to administrative proceedings. Regan also pursues associated state law contract, tort, and Maine Human Rights Act claims. The Defendants are collectively represented and have filed a comprehensive motion for summary judgment against all claims. The Plaintiff has cross-moved for limited summary judgment on a solitary state law issue. The Court referred the motions to me for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Based on the following report of the summary judgment record and discussion of the governing law, I recommend that the Court grant the Defendant's Motion for Summary Judgment as to the sole federal claim and decline to exercise jurisdiction over the pendent state law claims, thereby mooting Plaintiff's Cross-Motion.

## FACTS

The following facts are drawn from the parties' competing statements of material facts, filed in accordance with Local Rule 56, and from the record cited in support of those statements. See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion);  Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).

School Administrative District 63 (SAD 63) is a Maine school administrative district covering the towns of Holden, Eddington, and Clifton.  (Defs.' Statement of Facts (DSF) ¶ 2, Doc. 35-2.)  SAD 63 is governed by a Board of Directors that holds regularly scheduled meetings once per month and, on occasion, in special sessions.  (DSF ¶ 9;  Pl.'s Opposing Statement and Statement of Additional Facts (PSF) ¶ 9, Doc. 56.)  The public is invited to attend all SAD 63 board meetings.  (DSF ¶ 10.)  Dion Seymour, Karen Clark, Robert Kiah, Therese Anderson, and Linda Goodrich live in the surrounding community and served as members of the SAD 63 Board at all times relevant to this lawsuit.  (DSF ¶¶ 3-7.)

Plaintiff Louise M. Regan served as the Superintendent of Schools for SAD 63 between 2003 and 2008 under successive contracts.  Regan and SAD 63 were not the only parties to Regan's employment contract.  As a cost saving measure, the school boards of SAD 63 and Consolidated School District No. 8 (CSD 8)[1] gathered together as a "joint board" and resolved to each contribute a portion of the Superintendent's salary.  (DSF ¶ 25.)  SAD 63 disavows the

---

[1]       CSD 8 is a Maine Community School District consisting of the towns of Aurora, Osborn, Amherst, and Great Pond.  (DSF ¶ 8.)

existence of any official "Joint Board" entity, and characterizes the arrangement exclusively as a cost sharing arrangement.  Regan, on the other hand, says the "Joint Board" is a separate entity and, more to the point, the only entity that has the authority to terminate her employment.  She observes that the respective boards not only identified themselves as acting jointly for purposes of her employment, but also elected a chairperson, vice chairperson, and secretary for the "Joint Board."  (DSF ¶¶ 27, 29; PSF ¶ 27;  Goodrich Dep. Ex. 78, Doc. 66-2.)  Regan concedes that the superintendent owes separate and distinct duties to each of the two school districts, but she maintains that they have relinquished their authority to independently terminate her employment because they formed a "joint supervisory unit" in order to hire her and must act through that vehicle in matters affecting her employment.  (PSF ¶ 34.)

The latest contract governing Regan's employment as superintendent includes a provision that she may be terminated only for "just cause."  (DSF ¶ 39.)  Regan inserted this provision into the contract in December 2006, modifying language from her prior contract.  According to Regan, she told the chair of the joint board that she would be making a modification to this part of the contract before the chair executed the contract.  (DSF ¶ 39;  PSF ¶¶ 39, 42, 130.)  The parties executed the contract and Regan continued to serve as superintendent for both CSD 8 and SAD 63.  (PSF ¶ 112.)

In October 2007, Defendants Robert Kiah and Dion Seymour contacted Regan's administrative assistant, Susan Mckenzie, about gaining access to tape recordings of a September 2007 SAD 63 board meeting.  (PSF ¶ 134.)  Mr. Seymour managed to obtain possession of the tapes the next day and he apprised Ms. Mckenzie that he had removed the tapes from the superintendent's office.  (PSF ¶ 136.)  The following day, although aware of the fact that a board member had removed the tapes, and although she had the tapes back in her office at the time,

3

Regan involved the police by reporting "unauthorized removal of the tapes," though she withheld the identity of the "responsible" party.  (PSF ¶ 139; Verified Third Amended Compl. ¶¶ 27-28, 30.)

During a regularly scheduled meeting of the SAD 63 Board on October 22, 2007, board member Dion Seymour moved to amend the agenda in order to read a "letter of concern" (Doc. 63-6)[2] he authored.  (DSF ¶¶ 43-44, 49.)  The Board voted to allow him to proceed during the public session.  (DSF ¶¶ 50, 52-53; PSF ¶ 51.)  When some board members moved to have the matter continued in executive session, a majority of the Board voted to permit Mr. Seymour to continue his address in the public session.  (DSF ¶¶ 54-55.)  Regan, three board members, and others walked out of the meeting in protest.  (DSF ¶ 56.)  Regan walked out even though it was her duty to record the minutes of the board meeting.  (DSF ¶¶ 48, 56.)  The board members who remained are the individual defendants in this action.  (DSF ¶¶ 57-58.)  After Mr. Seymour finished his statement, board members Sirois, Ellis, and Berthiaume returned to the meeting.  (DSF ¶ 62.)  After completing the remaining items on the agenda, all of the board members entered executive session and Regan attended the executive session as well. (DSF ¶¶ 63-64.)  When the SAD 63 Board returned to public session, Dion Seymour publicly rescinded his letter of concern before the meeting adjourned, though the Board offered no public statement concerning the same.  (DSF ¶ 65; PSF ¶ 65.)  After this board meeting, Defendants Anderson, Clark, Goodrich, and Kiah gathered and spoke in the parking lot and Anderson stated that they needed to get rid of Regan and "nail the coffin shut."  (PSF ¶¶ 148, 150-151.)

---

[2]      The parties dispute how the content of the letter should be characterized.  (DSF ¶ 143;  Defs.' Reply Statement ¶ 143, Doc. 82.)  Essentially, Mr. Seymour defended his conduct, offered his account of why he had sought the tapes and what transpired, accused Ms. Regan of being dishonest, opined that Ms. Regan's conduct would warrant termination for "just cause," and asked the Board to "demand her resignation."  (Doc. 63-6.)

On or about November 7, 2007, Regan served a notice of tort claim on SAD 63 as well as on board members Seymour, Goodrich, Clark, Kiah and Anderson, asserting defamation as her cause.  (PSF ¶ 154;  Notice of Claim, Doc. 71-2.)  She followed this one week later with a whistleblower retaliation charge filed with the Maine Human Rights Commission.  (PSF ¶ 155; Charge of Discrimination, Doc. 71-3.)  Shortly after Regan filed her notice of tort claim, an unidentified SAD 63 board member expressed anger in the press alleging that Regan had broken a "gentleman's agreement" reached on the evening of October 22, 2007, by filing her notice of claim.  (PSF ¶ 160.)

In December 2007, Defendants Karen Clark and Linda Goodrich met with Attorney Melissa Hewey, of the Law Firm of Drummond Woodsum, in relation to the prelitigation notice and the Maine Human Rights Act charge.  (PSF ¶ 165; Def.'s Reply Statement (DRS) ¶ 165, Doc. 82.)  Clark shared with Attorney Hewey some negative community gossip about Regan. (PSF ¶ 166.)

On March 21, 2008, Ms. Clark and Ms. Goodrich, together with Attorney Bruce Smith of Drummond Woodsum, had a telephone conference with Susan Gendron, Maine's Commissioner of Education.  The conversation informed the Commissioner of the status of the dispute and sought her assistance is achieving a resolution.  (PSF ¶¶ 173-174;  DRS ¶¶ 173-174.)

At a regularly scheduled board meeting on March 24, 2008, the five defendant board members and two others voted to enter executive session and they discussed with counsel matters pertaining to Regan's employment and pending litigation.  (DSF ¶¶ 67-68, 70, 75;  PSF ¶ 75.)  Defendants cite 1 M.R.S. § 405(6)(E) to justify entering executive session.[3]  Regan

---

[3]      Maine's Freedom of Access law restricts what may be discussed in executive sessions and the subsection cited by the Defendants permits "consultations" with counsel "concerning the legal rights and duties of the body or agency [or] pending or contemplated litigation."  1 M.R.S. § 405(6)(E).  There is another exception for discussion of

maintains that the board members discussed inappropriate matters in executive session related to what charges they might bring against Regan "in preparation for convening a termination investigation of her." (DSF ¶75; PSF ¶ 75.) The Defendants state, somewhat consistently, that they went into executive session "to obtain the advice of counsel regarding whether the SAD 63 Board had the legal right to convene an investigation of Louise Regan, prior to considering her discharge." (DSF ¶ 81.) When the Board emerged from executive session it was 10:50 p.m., and they returned to public session at that time. (DSF ¶ 83.) Defendant Robert Kiah, III, made the following motion, which was approved by the SAD 63 Board: "The Board of School Directors hereby votes to instruct its legal counsel to conduct or cause to be conducted an investigation under 20-A Me. Rev. Stat. 1052 into the possible existence of cause to terminate the employment of the superintendent of schools, Louise M. Regan." (DSF ¶ 84.) This motion passed by a public vote of the SAD 63 Board. (DSF ¶ 85.)

On April 3, 2008, following a mass mailing sent out by Regan, Defendant Clark sent a fax letter to Attorney Bryan Dench (Doc. 64-4) in which she stated that she wanted Regan "out + out NOW!!" (PSF ¶ 188.)

On April 21, 2008, Regan's counsel, Attorney Thad B. Zmistowski of the Eaton Peabody Law Firm, requested that the investigation of cause for her termination be conducted in the public record. (DSF ¶ 87.)

On April 24, 2008, Regan commenced a civil action in the Maine Superior Court. (See Superior Court Summons and First Am. Compl., Doc. 1-3.) With this action Regan sought injunctive and declaratory relief related to her theories about how the Superintendent Discharge

---

employment matters, but Regan may have informed the Board of her election to have matters related to her employment discussed in the public session. See id. § 405(6)(A)(3).

Statute interacts with Maine's Freedom of Access Statute to require a predeprivation process different from what was afforded to her.  Regan also claimed that the SAD 63 Board lacked the legal authority to engage in any discharge proceedings without acting in combination with the CSD 8 Board.  (Id.)

SAD 63's counsel for the termination matter, Attorney Bryan Dench of the Law Firm of Skelton Taintor & Abbott, employed another attorney in his firm, Attorney Stephen Wade, to conduct the investigation for the Board.  (PSF ¶¶ 209-214;  DRS ¶ 209.)  Regan states in her additional statement that she "was never given notice of the charges [ ] S.A.D. #63 was considering against her until receipt of Attorney Wade's May 12, 2008 letter which set them forth."  (PSF ¶ 217, citing May 12, 2008, Letter from Attorney Wade to Attorney Zmistowski, Doc. 63-17.)  The letter identifies the following ten "areas of investigation" in anticipation of an interview to be conducted of Regan at Attorney Zmistowski's office:

**Areas of Investigation**
**Louise Regan – May 12, 2008**

Have the Superintendent's dealings with the School Board from and including August 2007 been professional and honest?  If not, have those unprofessional or dishonest dealings undermined the confidence of the School Board?

Did the Superintendent order that the October 22, 2007, meeting not be recorded contrary to the existing practice?  Is so, was there a legitimate reason for that?

Does the Superintendent bear responsibility in whole or in part for misrepresentations that were made to certain School Board members about the destruction of the tape recording of the September 24, 2007, Board meeting and otherwise the handling of the meeting records of the September, 2007 Board?

Did the Superintendent act professionally in dealing with representations made by her staff to School Board members about the destruction of the September, 2007, School Board meeting recording?

7

> Did the Superintendent submit a letter of intent for a consolidation plan with Orono, Glenburn and Veazie without authorization of the full Board?
>
> Did the Superintendent keep the full Board aware of her letter of intent filed with regard to consolidation with Orono, Glenburn and Veazie?
>
> Did the Superintendent walk out of the October 22, 2007 Board meeting while the meeting was being conducted and, if so, were the circumstances unprofessional?  Was walking out of the meeting in violation of her contract?
>
> Did the Superintendent obstruct or otherwise act unprofessionally in conjunction with the SAD 63 and CSD 8 Boards' efforts to meet and consider whether to investigate the Superintendent?
>
> Has the Superintendent attended all Board and committee meetings that she should and is obligated to by her contract?
>
> Did the Superintendent have any responsibility for the lack of adequate communications identified in the Maine DOE inspection report?  Was her letter to the community regarding the report authorized by the Board?  Was it accurate?

(Doc. 63-17.)  This list was provided in Attorney Wade's letter in anticipation of an interview of Regan that Attorney Wade wished to conduct at Attorney Zmistowski's office.  This meeting never occurred because Regan sought and obtained a temporary restraining order from the Maine Superior Court two days prior to her scheduled interview.  The TRO was subsequently lifted,[4] but it appears that Regan never consented to an interview with Attorney Wade and that she took the position that the proceedings against her were invalid and unauthorized.  (PSF ¶¶ 217-220, 224-225;  see also Attorney Wade's July 17, 2008, Investigative Report at 1, Doc. 63-5.)[5]

On June 2, 2008, the Defendants filed in this Court a notice of removal of the state court action.  (Doc. 1.)  The notice of removal was premised on the fact that Regan filed, in early May,

---

[4]     Justice Anderson of the Superior Court preliminarily took to view that the Board's action was likely unlawful because Regan was hired by the Joint Board and not by the SAD 63 Board alone.  (Order at 3, Doc. 26-28.)  He concluded, however, that the record did not demonstrate irreparable injury to Regan in the absence of an injunction barring the investigation from proceeding.  (Id. at 3-4.)

[5]     For the same reason, Regan later refused to participate in a question and answer dialogue with the Board during her subsequent hearing on July 29, 2008.

2008, a motion to amend her state court action to include a civil rights claim pursuant to 28 U.S.C. § 1983.  (Id. ¶¶ 1-4;  Pl.'s Verified Second Am. Compl., Doc. 1-4.)

On July 17, 2008, Attorney Wade issued his investigative report.  (PSF ¶ 228.)  For convenience, without incorporating the document herein, the relevant headings in the document read as follows:  "Submitting Letter of Intent to State Board of Education without Authorization of the SAD 63 Board," "Misrepresentation Made to the School Board Members about the Board Tapes," "Louise Regan's Order to Not Record a Controversial School Board Meeting," "Ms. Regan Walked Out of the October 22, 2007 Board Meeting," "Did the Superintendent Obstruct the SAD 63 and CSD 8 Boards' Efforts to Meet and Consider Whether to Investigate the Superintendent?," "Has the Superintendent Attended all the Board and Committee Meetings that She Should?," "Louise Regan's Failure to Disclose Changes in the Terms of Her Contract," and "Misrepresentation of Credentials."  (Investigative Report, Doc. 63-5.)

On July 24, Attorney Dench provided plaintiff's counsel with Attorney Wade's investigative file.  (DRS ¶ 227, citing Dench Supplemental Aff. ¶ 4, Doc. 82-3;  PSF ¶ 232.)

On July 29, 2008, members of the SAD 63 Board convened what they called a special meeting of the "Joint Board" to consider the matter of Regan's termination, though none of the members of CSD 8 Board attended.  (DSF ¶ 89;  PSF ¶¶ 89, 236.)  Prior to this meeting, the SAD 63 Board held its own special meeting.  (DSF ¶ 90.)  Regan admits that she was notified of these meetings by a letter dated July 18, 2008, and that the letter included a copy of the investigative report prepared by Attorney Stephen Wade, and a copy of the agenda of the July 29 meeting indicating that her termination would be considered.  (DSF ¶ 91;  PSF ¶ 91.)  Regan attended both of these meetings with Attorney Zmistowski.  (DSF ¶ 92.)  In attendance for the SAD 63 Board were Defendants Anderson, Clark, Goodrich, and Kiah, and also non-party board

9

members Ellis, Varnum, and Dorr, though Ms. Dorr abstained from voting.  (PSF ¶¶ 142, 235.)

During each meeting, a vote was passed to terminate Regan's employment.  (DSF ¶ 97.)  Prior to

the vote, Regan presented the Board with a 19-page written response to the charges set forth in

Attorney Wade's investigative report.  (PSF ¶ 237, citing Response of Louise M. Regan, Doc.

63-4.)  In addition to presenting the Board with this written response, Attorney Zmistowski

sought to read it aloud to the Board, but was denied that opportunity.  However, following a brief

recess that was taken, ostensibly, in order for the Board to review Regan's written response,[6]

Attorney Zmistowski, on behalf of Ms. Regan, was permitted to address the Board orally at some

length in regard to Attorney Wade's investigative report.  (PSF ¶¶ 238-239;  DRS ¶¶ 238-239;

July 29, 2008, Special Meeting Trans. at 64-96, Doc. 68-4.)  The Board then went into executive

session to deliberate and Regan and her counsel were in attendance.  In the executive session,

Ms. Clark voiced a complaint about Regan's institution of a tort action over Dion Seymour's

statements in public session (which were later rescinded by him) and Ms. Anderson expressed

disappointment that Regan had consulted a private attorney concerning the removal of the tapes

from the office rather than SAD 63's attorney.  (PSF ¶¶ 249-250.)  The vote to terminate Regan's

employment was four in favor, two opposed, with one abstaining.  (July 29, 2008, Special

Meeting Trans. at 97.)  The motion that carried the termination question read, in relevant part:

"the board expressly finds that there is cause to discharge Louise M. Regan as superintendent of

schools . . . on the basis of the [Skelton Taintor] investigative report *and otherwise*."  (PSF ¶ 251

(emphasis added).)  On August 25, 2008, the SAD 63 Board adopted findings of fact and

---

[6]      There is record support for a finding that the board members who voted to terminate Regan's employment
gave very limited attention to the written response, though they were present for Attorney Zmistowski's oral address
following the recess.  (PSF ¶¶ 240-243, citing Anderson, Clark, Goodrich, and Kiah deposition transcripts.)  The
transcript of the July 29, 2008, meeting reflects that Attorney Zmistowski refused to let the Board engage Ms. Regan
in a dialogue.

conclusions regarding its investigation and grounds for discharging Regan as Superintendent of

Schools for SAD 63, effective July 29, 2008. (DSF ¶ 98;  Findings of Fact and Conclusions,

Doc. 35-9.)  Following some preliminary remarks, the findings and conclusions read as follows:

> 1. The MSAD #63 expressly finds that Louise M. Regan has not been lawfully
> appointed Superintendent of schools for the MSAD #63 according to 20-A Me.
> Rev. Stat. § 1051.  There has never been a vote of the MSAD #63 Board of
> Directors at a lawfully called and noticed meeting of the MSAD #63 to employ
> Ms. Regan as Superintendent for the MSAD #63.
>
> 2. The vote taken December 13, 2006, at a meeting of the so-called "Joint Board"
> composed of all directors of the MSAD #63 and of CSD # 8 was not a meeting
> called and noticed as a meeting of the "Joint Board."
>
> 3. There is no clear evidence that a school union including the MSAD #63 and
> CSD #8 was ever formed, and it appears that the only approval provided by, the
> then Commissioner of Education H. Sawin Millet in 1977 was permission to share
> the services of a Superintendent.  There is no factual basis to conclude today that
> the MSAD #63 and CSD 8 are members of a school union, or any school
> administrative unit.  Therefore, the MSAD #63 concludes that any meeting of the
> two MSAD #63 and CSD #8 is not a lawful meeting of each individual District.
>
> 4. Alternatively, if validly employed as Superintendent for the MSAD #63, the
> MSAD #63 Board of Directors, expressly finds that there is cause to discharge
> Louise M. Regan as Superintendent of schools from Maine School Administrative
> No. 63 according to 20-A Me. Rev. Stat. § 1052 and to terminate her employment
> contract dated July 1, 2007, on the basis of the investigative report and other facts,
> including the following:
>
> > A. Ms. Regan participated in the filing of a Notice of Intent to consolidate
> > with Glenburn, Veazie and Orono without proper authorization of the MSAD #63
> > Board of Directors and without informing the Board of Directors.
> >
> > B. Her attorneys say she did that with the authorization of the then MSAD
> > #63 Chair, Pat Sirois. The Board of Directors never voted to authorize the then
> > Chair or Ms. Regan to submit such a Notice of Intent and as Superintendent Ms.
> > Regan knows, or should know, that the MSAD #63 Chair acting alone does not
> > have authority to authorize such a filing.
> >
> > C. Board members learned of the filing only when the newspaper
> > published an account that the unauthorized Notice of Intent had been accepted by
> > the Commissioner of Education.  When Board members expressed concern, the

Superintendent purported to withdraw the Notice of Intent, which had already been approved.

D. When controversy emerged over the Notice of Intent, the MSAD #63 Board of Directors attempted to obtain access to tapes of MSAD #63 meetings to verify that, contrary to the Superintendent's contention, the Board of Directors had never authorized filing the Notice of Intent.  Board members were not granted ready access to the tapes and were told various things that were not true about them.

E. The superintendent's secretary at first stated tapes of the meeting existed.  After speaking with Ms. Regan and getting the distinct impression it would be better for Ms. Regan if the tapes did not exist and the subtle suggestion from Ms. Regan the tapes should be withheld or disposed of, the secretary changed her statements to MSAD #63 Board of Directors and said the tapes did not exist.  Ms. Regan said to the secretary, "Well, you do the minutes accurately?" and later, "I assume there's nothing on the tapes that could hurt anyone?"  These statements caused her secretary to infer that she did not want the secretary to preserve or turn over the tapes.

F. When on October 18, 2007, a concerned MSAD #63 Board member came to the Central Office and obtained the tapes for safekeeping, with prior notice to the secretary, Ms. Regan demanded that the tapes be returned, which the MSAD #63 Board member did.  After he did she consulted her personal attorney, not the MSAD #63's attorney, and then reported to the local police that the tapes had been stolen though she had them in her possession.

G. At a meeting later on October 18, 2007, Ms. Regan made statements to MSAD #63 Board of Directors to the effect that this Board member who had removed the tapes did so when the secretary was there by "going around" her and removing them without proper authorization or reasons.  In fact he did this by invitation and was told where to find the tapes, by the secretary, when she first told the Board member that the tapes were being thrown out.

H. When the MSAD #63 Board of Directors met on October 22, 2007, Ms. Regan ordered her secretary, contrary to the usual practice, not to tape record the meeting.  This had never happened before.  It never happened after that meeting.  The meeting was expected to be controversial and to involve discussion of Ms. Regan's actions in filing the Notice of Intent that the Board of Directors had not approved.

I. At the meeting of October 22, 2007 the MSAD #63 Board of Directors voted to allow the member who had removed and then returned the tapes to speak.  He read a statement in which he defended his own integrity in response to the statements of Ms. Regan and in which he questioned her integrity.  She walked

12

out of the meeting and was followed by others, leaving the MSAD #63 Board with a quorum of five but no secretary.  The meeting was heated and the MSAD #63 Board member later rescinded his statement and the MSAD #63 Board of Directors apologized. Board members believed the matter to be put to rest at that point.

J. On November 7, 2007, however, Ms. Regan served notices of tort claim under the Maine Tort Claims Act on the five members of the MSAD #63 who had sat in the meeting after she walked out and while the MSAD #63 member read his statement, the statement he later rescinded.

K. When the MSAD #63 Board of Director's were attempting to consider matters relating to Ms. Regan's employment as Superintendent with Joint boards of MSAD #63 and CSD #8 as the purported Joint Board, Ms. Regan took steps to threaten the CSD # 8 Board members with litigation if they participated.

L. According to MSAD #63 policies, the Superintendent has a duty to attend all meetings of the MSAD #63 and its subcommittees.  She has a duty to prepare and submit recommendations to the MSAD #63 Board of Directors and its subcommittees and to place before them "necessary and helpful facts, information and reports as are needed to ensure the making of informed decisions."  Policy CBC.

M. In school year 2006/2007, Ms. Regan attended 13 of 20 meetings for a 35% missed rate.  In 2007/2008, her attendance was 4 of 15 meetings, for a miss rate of 73%.  This excludes meetings missed due to vacation or medical leaves.

N. Ms. Regan has a written employment contract that runs from July 1, 2007 through June 30, 2010.  It was approved only by the so-called "Joint Board" of MSAD #63 and CSD #8.

O. During the negotiation of her current contract with the so-called Joint Board of MSAD #63 and CSD #8, Ms. Regan requested six (6) specific changes with respect to the terms of her employment, as follows:

    1. Vacation time
    2. Travel stipend
    3. Life insurance
    4. Sick leave
    5. Dental insurance
    6. Compensation

She did not request or mention anything about the terms of her contract regarding termination of her employment.

P. Without telling the Joint Board of Directors or in any way bringing it to the attention of the Joint Board, Ms. Regan changed the language of her contract regarding termination.  All of her prior contracts back to 2003 stated that her employment could be terminated for cause according to the statutes of the State of Maine.  However, in the current contract, Ms. Regan changed unilaterally to provide that "the Superintendent shall not be subject to discharge without just cause."  This change was not brought to the attention of the Joint Board.  When the Joint Board asked to review Ms. Regan's prior contract, she told them it was confidential and they could not review it, leading the Joint Board of Directors to conclude only the six specifically agreed upon terms had been changed.

Q. The MSAD #63 District has a collective bargaining contract with its teachers that does not provide for "just cause" for dismissal of teachers.  The MSAD #63 Board of Directors has never accepted a contract with the term "just cause."

R. On her employment application with the MSAD #63 in 1997 Ms. Regan stated her undergraduate GPA as 3.69.  The MSAD #63's investigator was informed by the university that her undergraduate GPA was 2.93.  Ms. Regan's counsel stated to the MSAD #63 Board of Directors that she had two undergraduate degrees, and that as to one, her GPA was 3.69 and as to the other, it was 2.93.  His explanation was that Ms. Regan only had one line on the application form to fill in her undergraduate degree and so she provided the more recent higher one only.  The MSAD #63 Board of Directors received no explanation to why both GPA's and transcripts were not furnished.  This is less than forthright but the Board of Directors considers this a relatively minor instance of untrustworthiness compared to other matters and places no reliance upon it in reaching its decision.

5. The MSAD #63 Board of Directors, further finds that the provision in paragraph 3 of said contract providing for dismissal of Ms. Regan only for "just cause" is void and of no effect as (a) it violates state law, and (b) it was placed in the contract by Ms. Regan without the knowledge or consent of the MSAD #63 and is not enforceable.

6. Based on her conduct, including that described above, the MSAD #63 Board of Directors has lost confidence in Ms. Regan's trustworthiness and has lost confidence in her ability to lead the District and to carry out the policies and decisions of the District, as required under MSAD #63 policy.  The MSAD #63 Board of Directors, no longer wishes to employ Ms. Regan as its chief executive officer and educational leader.

7. The MSAD #63 Board of Directors therefore determines that if there is a valid appointment of Ms. Regan as Superintendent of the MSAD #63, cause exists for her employment to be terminated according to Me. Rev. Stat. 20-A section 1052.

14

> The MSAD #63 Board of Directors further finds and concludes that were the "just cause" provision valid and binding, there is also "just cause" to terminate her contract as aforesaid.
>
> Accordingly, if indeed Louise M. Regan is the Superintendent of the MSAD #63 according to law, then the MSAD #63 Board of Directors, hereby discharges Louise M. Regan as Superintendent of schools for the MSAD #63 effective July 29, 2008.  If and to the extent she has a contract binding on the MSAD #63, the Board of Directors, terminates her contract accordingly.

(Doc. 35-9.)

On July 30, 2008, this Court denied Ms. Regan's motion to remand her civil action to the Maine Superior Court due to her inclusion of a federal claim.  (Doc. 16.)

On August 6, 2008, Regan's counsel wrote to the Commissioner of Education to "appeal the M.S.A.D. 63 Board's actions and request that a *de novo* hearing be scheduled at [the Commissioner's] earliest convenience."  (DSF ¶ 99.)  In an August 27, 2008, letter, Assistant Attorney General Sarah Forster wrote to counsel on behalf of the Commissioner to elicit their views on, among other things, the standard of review that the Commissioner would need to apply in regard to Regan's appeal, in particular, whether the hearing mandated by the statute is a *de novo* evidentiary hearing.  (Doc. 35-14 at 15.)  The Commissioner subsequently stayed the appeal, at Regan's request, pending judicial determination of her claims for declaratory relief. (DSF ¶ 100.)  SAD 63 filed a Maine Rule 80C petition in the Superior Court in Kennebec County contesting the Commissioner's decision to stay the administrative proceeding and requesting a court order compelling the Commissioner to address the appeal.  (Doc. 35-14 at 4.)  On January 21, 2009, Superior Court Justice Joseph M. Jabar issued a decision stating that he would not issue such an order.  (Zmistowski Aff. ¶ 19,  Doc. 57.)  The central point of Justice Jabar's decision is that Regan is entitled to a *de novo* hearing before the Commissioner, including discovery and a right to present evidence and examine witnesses, and not merely a review of the

15

paper record developed by the Board, which is consistent with my reading of 20-A M.R.S. §

1052 and my discussion of due process requirements, outlined below.  Justice Jabar concluded,

however, that the stay entered by the Commissioner should not be set aside because "[i]t would

be inefficient for the parties to proceed through a discovery process in the appellate procedure as

well as a discovery process in the federal litigation."  (Jan. 21, 2009, Decision of the Superior

Court, Me. Sch. Admin. Dist. 63 v. Comm'r of the Dept. of Educ., No. AP-08-77, Doc. 92.).  The

administrative appeal remains stayed at this time.  (DSF ¶ 102;  PSF ¶ 259.)  The Defendants

have filed a notice of appeal with the Law Court seeking review of Justice Jabar's decision.

(Doc. 92-2.)

Of the four school board members who voted to terminate Ms. Regan's employment,

there is some evidence that two, Karen Clark and Linda Goodrich, had some reason to personally

dislike Regan.  Regan attests that Clark, in 2003, unsuccessfully interviewed for a job that Regan

had the authority to fill[7] (PSF ¶¶ 114-115) and that Goodrich, a former employee of SAD 63,

was denied unemployment benefits after separation from her job, under circumstances where

Regan had contested Goodrich's application for benefits (PSF ¶¶ 117-121).  This event, too,

occurred sometime in the 2003 timeframe.  (PSF ¶¶ 112, 118.)  It is not stated when Clark and

Goodrich joined the Board.

### DISCUSSION

Summary judgment "should be rendered if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is

---

[7]        Clark denies seeking employment with the District.  (DRS ¶¶ 115-116.)

material if its resolution would "affect the outcome of the suit under the governing law," and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. P. R. Elec. Power Auth. v. Action Refund, 515 F.3d 57, 62 (1st Cir. 2008). If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 241 (1st Cir. 2006).

The Defendants' Motion for Summary Judgment challenges all of the claims alleged in the Third Amended Complaint. I begin with the federal claim because that is the only claim over which the Court must exercise its jurisdiction.

**A.      42 U.S.C. § 1983**

In the Third Amended Complaint that was operative when the summary judgment motion was filed (now superseded by the Fourth Amended Complaint),[8] Regan asserted a claim pursuant to 42 U.S.C. § 1983, contending that the Defendants, acting under color of state law, violated her federal due process, privacy, free speech, and equal protection rights. (Third Am. Compl. at 40, Doc. 28.) With respect to due process, Regan alleges deprivations of her rights in property (continued employment) and liberty (her reputation). (Id.; Pl.'s Opposition Mem. at 14, 26, Doc. 55.) The Defendants assert in their motion that this case "is a predeprivation due process case in

---

[8]      The currently operative Fourth Amended Complaint introduces two Maine Human Rights Act claims. Count VIII alleges whistleblower retaliation and Count IX alleges retaliation for filing a charge with the Maine Human Rights Commission. (Fourth Am. Compl., Doc. 86.) Regan received her right to sue letter from the Maine Human Rights Commission near the end of discovery on the preexisting claims.

which all due process rights were respected."  (Mot. at 3, Doc. 35.)  They argue that Regan fails

to adequately plead anything else in support of her § 1983 claim.[9]  (Id. at 25-26.)  In her

opposition memorandum, in a section entitled "Ms. Regan's Claim Pursuant to 42 U.S.C. §

1983," Regan advances her due process claim *exclusively*, without offering any discussion of the

First Amendment, fundamental privacy rights, or equal protection.  I treat these extra recitations

in the wherefore clause of Regan's civil rights claim (Count VI) as abandoned for purposes of

this litigation, and I address the civil rights claim as Regan has, *i.e.*, exclusively as a due process

claim.[10]

Section 1983 of the Civil Rights Act confers upon every United States citizen a right to

redress against any person who, acting under color of state law, causes a deprivation of "rights,

privileges, or immunities secured by the Constitution and laws" of the United States.  42 U.S.C.

§ 1983.  The Defendants do not dispute that they acted under color of state law with respect to

the material factual underpinnings of this case.  I therefore proceed directly to the merits of the

due process claim.  In that claim Regan asserts a deprivation of two interests:  a property interest

in continued employment and a liberty interest in her reputation.  The Defendants do not argue

that either of these interests is somehow invalid for purposes of Regan's due process claim.  I

assume for purposes of the procedural due process discussion that the alleged reputational injury

requires procedural protection under the Constitution every bit as much as the termination of

Regan's "for cause" (or "for just cause") public employment.  The question, consequently, is

whether Regan received, or stands to receive, sufficient process from the State of Maine.

---

[9]      They also argue that Regan failed to adequately plead a due process violation, but it is abundantly clear from the Third Amended Complaint that this case involves a due process claim.
[10]      During oral argument on the motion, Regan's counsel agreed with my assertion that the federal claim is exclusively a due process claim at this juncture.

### 1.  *Regan received the minimum predeprivation process required by* <u>*Cleveland Board of Education v. Loudermill*</u>*.*

The Due Process Clause requires that deprivation of public employment be preceded by "some kind of a hearing" when continued employment has been promised absent "cause" for termination.  <u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542 (1985) (quoting <u>Board of Regents v. Roth</u>, 208 U.S. 564, 569-70 (1972)).  The Due Process Clause also requires that the state must afford a hearing prior to the imposition of any stigma that calls an individual's "good name, reputation, honor, or integrity" into question, results in an alteration of the individual's legal status, and undermines the plaintiff's future employment prospects.  <u>Roth</u>, 408 U.S. at 573 (quoting <u>Wisconsin v. Constantineau</u>, 200 U.S. 433, 437 (1971));  <u>see</u> <u>also</u> <u>Paul v. Davis</u>, 424 U.S. 693, 709-10 (1976) (narrowing <u>Roth</u> in the public employment arena by requiring constitutional protection only if stigma was imposed along with a termination in employment).  Such a hearing must afford the concerned employee with "some pretermination opportunity to respond," <u>Loudermill</u>, 470 U.S. at 542, because "[d]ismissal for cause will often involve factual disputes" and, "[e]ven where the facts are clear," their significance in relation to continued employment may not be, <u>id.</u> at 543 & n.8.  Balanced against this requirement is the governmental body's desire to act efficiently in matters of employee discipline.  Because of this counterweight, public employees are not entitled to a full evidentiary hearing *prior* to a deprivation.  <u>Id.</u> at 545.  A predeprivation hearing need only provide an opportunity to challenge the accuracy of the employer's charges and whether they reasonably support the proposed disciplinary action.  <u>Id.</u> at 545-46.  Inherent in this requirement is an expectation that the public employer will provide notice of the charges, orally or in writing, and a description of the employer's evidence.  <u>Id.</u> at 546.  In short: "Before a tenured public employee is discharged, she is entitled to oral or written

19

notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story." Acosta-Sepulveda v. Hernandez-Purcell, 889 F.2d 9, 12 (1st Cir. 1989) (internal citation and quotation marks omitted).  These are the "minimum procedural requirements" that must be afforded as a matter of federal law.  Loudermill, 470 U.S. at 541 (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980)); see also Codd v. Velger, 429 U.S. 624, 627 (1977) (citing Roth, 408 U.S. at 573 & n.12, and requiring an opportunity to refute the charge and clear one's name where stigmatizing reputational injury is at stake).

Maine law conditions the discharge of a superintendent on the following process:

1. REQUIREMENTS. The superintendent may be discharged only:

   A. For cause;

   B. After due notice and investigation; and

   C. By a majority vote of the full membership of the school board.

2. SALARY. On discharge, the superintendent's salary shall cease.

3. APPEAL. The superintendent may appeal the school board's decision to the commissioner.  The commissioner shall hold a hearing as part of the appeal.

20-A M.R.S. § 1052.  The requirements for discharge stated in this provision do not literally describe a predeprivation opportunity for the superintendent to be heard in answer to the charges against her.  Rather, it calls for due notice, an investigation, and a vote.  Given this language, a poorly advised school board might well fail to provide a superintendent with an opportunity to respond prior to voting on a discharge motion.  Regan argues that her experience proves the point; that the Board launched an investigation to identify causes for her termination and only finally expressed one or two of its reasons for terminating her during the final executive session.  (Pl.'s Opposition Mem. at 16-18;  PSF ¶¶ 252-253.)  Here Regan has in mind Ms.

Anderson's statement in executive session criticizing Regan's decision to consult with a private attorney concerning SAD 63 matters, Ms. Clark's statement in executive session criticizing Regan's institution of a tort action, and alleged anger over Regan's institution of tort proceedings despite an alleged agreement not to do so after the October 22, 2007, executive session.

Regan's contention that she did not receive adequate notice lacks merit.  Attorney Wade's investigative findings provided Regan with pretermination notice of a list of grounds deemed sufficient to justify the termination proceedings.  The termination hearing mirrored Attorney Wade's findings and Regan was afforded an opportunity to present her side of the story with respect to these investigative findings, both in writing and orally, prior to the vote that called for her termination. Among Attorney Wade's findings was a finding that Regan's own misconduct or lack of care was the source of the controversy over the handling of tape recordings and a finding that she had contacted the police to report a "theft" after consulting with her "personal" attorney. (Doc. 63-5 at 8 (emphasis in original).)  This sufficiently notified Regan of the concern raised by Ms. Anderson in executive session.  There could be no surprise in Ms. Anderson's indication that she personally disapproved of such conduct on Regan's part.  As for any statement by Ms. Clark criticizing Regan's commencement of legal proceedings against the Board and its members, including any concern over a perceived breach of a "gentleman's agreement" not to become litigious about the tape dispute issue and Mr. Seymour's statements, I disagree with Regan that she could not have anticipated the possibility of such a backlash, regardless of whether such a motive actually existed.  All of this litigious conduct commenced following the October 22, 2007, board meeting and there can be no doubt but that Regan fully understood the correlation between the issue of the tape recordings and her institution of charges against the Board.  Regan must also have understood at the time that her commencement of legal proceedings against the

SAD 63 Board and a majority of its members was something that could galvanize the nascent movement against her continued employment, whether it actually did so or not.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). Given her own voluntary institution of a tort claim and a whistleblower claim against the Board, based directly on the Board's, or certain board members', reaction to her own handling of the tape recording issue, Regan was fully apprised of the situation and was more than capable of presenting among her objections to the Board an objection that it could not terminate her in retaliation for bringing legal proceedings, or an objection that the termination proceedings were merely a pretext designed to mask such a motivation. Notice from the SAD 63 Board was not required in order to enable Regan to voice such objections as early as several months in advance of the termination hearing. This resolves the issue of adequate notice. Assuming for purposes of this claim alone that SAD 63 actually had the authority to terminate Regan's employment in this fashion, without the participation of the CSD 8 board members (who abstained *en banc*), this proceeding afforded Regan with the requisite pretermination notice and an opportunity to tell her side of the story. I turn next to the matter of bias.

### 2. *Bias on the part of the predeprivation decisionmaker is appropriately remedied in postdeprivation administrative proceedings when the postdeprivation decisionmaker has authority to conduct* **de novo** *fact finding and the evidence does not suggest the existence of bias on the part of the postdeprivation decisionmaker.*

On May 7, 2009, I conducted a limited oral argument out of concern that the parties were overlooking legal authority addressed to the question of whether available state postdeprivation

process is adequate to resolve the pending due process claim, citing <u>Chmielinski v.</u>

<u>Massachusetts Office of the Commissioner of Probation</u>, 513 F.3d 309, 318 & n.6 (1st Cir.

2008), and <u>Cronin v. Town of Amesbury</u>, 81 F.3d 257, 260 & n.2 (1st Cir. 1996) (per curiam).[11]

I did so because it appeared to me that, even if the Court were to assume that the SAD 63 Board

lacked legal authority to discharge Regan without the participation of the CSD 8 Board, and even

if the SAD 63 Board's decision to do so was influenced by personal bias, the State, in the person

of the Commissioner of Education, may still be in a position to ensure that Ms. Regan receives

adequate process for purposes of the Due Process Clause of the United States Constitution.

(Order Setting Limited Oral Argument, Doc. 91.)  I did not wish to base a portion of my

recommended disposition on a point of law that the parties had nowhere addressed in their

summary judgment papers.  At the same time, I did not wish to overlook precedent that appears

to be squarely on point and that suggests the appropriateness of further state process as opposed

to this federal case.  During the oral argument, Attorney Dench, counsel for the Defendants,

agreed with my major premise that postdeprivation proceedings here can cure any alleged

improprieties in the predeprivation process, even if the worst is assumed about his clients'

motivations.  He also argued that the issue of bias at a predeprivation hearing is only relevant, in

any event, if it prevents the employee from having an *opportunity* to respond and present facts in

her favor, referencing <u>Chmielinski</u>.  Because the Board afforded Regan an opportunity to

respond at the termination hearing, and because it also attempted more than once to interview her

---

[11]     In the currently pending state court proceeding between SAD 63 and the Commissioner, SAD 63 is
insisting that the process must run its course with the Commissioner despite the pendency of this federal action.
Implicit in this assertion is the position that due process is still transpiring and should be allowed to run its full
course.  However, in the pending summary judgment motion, the Defendants did not, in my view, crystallize the
issue of whether available postdeprivation proceedings could cure any alleged shortcomings in the predeprivation
process.  My order setting limited oral argument called upon the parties to address that very issue and the parties
were heard on that question.

to obtain her responses, the Defendants' position is that any evidence of bias could not have risen to an "unacceptable" or "intolerable" level, as a matter of law.  Attorney Zmistowski, on behalf of Ms. Regan, also focused his arguments on <u>Chmielinski</u>.  Ms. Regan's position is that footnote 6 of <u>Chmielinski</u> is not applicable to this case because state law does not require an unbiased predeprivation decisionmaker and that, otherwise, this case "is on all fours" with <u>Chmielinski</u> (except that, in her view, the evidence of bias is much stronger).  Regan's counsel focused the balance of his time arguing that Regan did not receive adequate notice, which he maintained would circumvent the question I asked the parties to address.  I will address what I consider to be the implication of <u>Chmielinski</u>, below, but first an overview of precedent addressed to the issue of bias.

The right to an unbiased "tribunal" has often been described as a fundamental requirement of due process. <u>See</u>, <u>e.g.</u>, <u>Beauchamp v. De Abadia</u>, 779 F.2d 773, 776 (1st Cir. 1985) ("An impartial decisionmaker is, of course, a fundamental component of due process.").  However, it is not a universal requirement of <u>pre</u>deprivation process.  Although a state must afford a "tenured" public employee with a hearing before an impartial tribunal, it need not do so at the pretermination stage.

> Before a tenured public employee is discharged, she is entitled to oral or written notice of the charges against her, an explanation of the employer's evidence, and an opportunity to present her side of the story.  This procedure complies with the essential requirements of due process:  notice and an opportunity to respond.  Contrary to the district court's premise, it is not required that a hearing be conducted before an impartial decisionmaker.  In fact, the hearing may be presided over by the employer . . . .

<u>Acosta-Sepulveda</u>, 889 F.2d at 12 (internal citation and quotation marks omitted); <u>see also</u> <u>Locurto v. Safir</u>, 264 F.3d 154, 174 (2d Cir. 2001) ("No … decisions from our Circuit or other circuits have held that . . . a neutral adjudicator is a necessary component of due process at a pre-

24

termination hearing. We hold that it is not.");  McDaniels v. Flick, 59 F.3d 446, 459-60 (3d Cir.

1995) (same): Walker v. Berkeley, 951 F.2d 182, 183-84 (9th Cir. 1991) (same); Duchesne v.

Williams, 849 F.2d 1004, 1006 (6th Cir. 1988) ("[T]he property interest created in the normal

government job covered by a civil service system, which creates a "just cause" requirement for

discharge, does not entitle the employee to an impartial judge at the pretermination 'right-of-

reply' hearing."), cert. denied, 489 U.S. 1081 (1989);  Garraghty v. Jordan, 830 F.2d 1295, 1302

(4th Cir. 1987) (same); Schaper v. City of Huntsville, 813 F.2d 709, 715 (5th Cir. 1987) (same).

Despite this line of precedent, there is a dissonant chord sounded in another line of cases,

represented in this Circuit by Chmielinski, in which it is stated that bias might reach such a level

as to become intolerable for purposes of due process.  513 F.3d at 317-318.  As I will attempt to

explain below, the latter cases, generally, if not consistently, present allegations of a biased

predeprivation hearing officer and there has been only limited postdeprivation review.  In cases

such as the instant case, however, where the prescribed process calls for a meaningful

postdeprivation hearing and not merely a limited review process, bias on the part of the

predeprivation hearing officer can be eclipsed by de novo fact-finding and disciplinary discretion

on the part of an unbiased postdeprivation hearing officer.  Such a process fully complies with

due process even if the predeprivation hearing officer's level of bias was greater than the level of

partiality that ordinarily exists when the employer presides at the predeprivation hearing.

 The legal question before the Court is whether a due process violation is necessarily

established, or effectuated, as soon as a predeprivation decisionmaker influenced by personal

bias renders a decision to terminate employment.  If the answer is yes, then, as in this case, state

postdeprivation appellate procedures are appropriately derailed by an assertion of a due process

violation in state or federal court, bypassing the possibility of a final administrative

determination, even if there is no evidence suggesting bias on the part of the appointed, postdeprivation hearing officer, and even if state procedures authorize the postdeprivation decisionmaker to consider factual and disciplinary issues *de novo*.  Additionally, if the answer is yes, then the Court will have to determine whether the factual presentation in this case demonstrates the kind of personal bias needed to support such a claim, as will any other court in which a colorable case of predeprivation bias is alleged.  For practical purposes, a jury trial, or at least a summary judgment motion, will necessarily be interjected into the dispute despite the availability of an unbiased postdeprivation hearing officer with meaningful fact-finding and discretionary authority.  But if the answer is no, then the Court should grant summary judgment against the due process claim because the record fails to depict any bias on the part of the Commissioner and Maine law requires the Commissioner to conduct a hearing on appeal and does not restrict her authority to consider factual and disciplinary matters afresh.  The following discussion reflects that the answer to the question is, no.

In Withrow v. Larkin, 421 U.S. 35, 52, 58 (1975), the Supreme Court held that "the combination of investigative and adjudicative functions" in a due process tribunal does not build an unconstitutional, structural bias into administrative, due process proceedings.  Id. at 47, 55.  However, the Court observed:

> That is not to say that there is nothing to the argument that those who have investigated should not then adjudicate.  The issue is substantial, it is not new, and legislators and others concerned with the operations of administrative agencies have given much attention to whether and to what extent distinctive administrative functions should be performed by the same persons.  No single answer has been reached.

Id. at 51.  The plaintiff physician in Larkin faced a loss of his license to practice medicine and obtained an injunction in federal district court to prevent the Wisconsin Examining Board from

determining the issue of license suspension where it had already conducted the investigative

hearing that raised cause for suspension.  Id. at 40-41.  The Supreme Court concluded that the

lower court got it wrong;  that "[t]he mere exposure to evidence presented in nonadversary

investigative procedures is insufficient in itself to impugn the fairness of the Board members at a

later adversary hearing," and that, unless there is a foundation for a finding of actual prejudice,

state administrators must be presumed to have acted fairly.  Id. at 55.  Although the

administrative action at issue was a predeprivation proceeding, the Supreme Court's decision

does not reveal whether there was any further postdeprivation, administrative process available.

It appears unlikely that there would have been under the Wisconsin statute because the final

predeprivation process planned by the Examining Board consisted of a "contested hearing."  Id.

at 40.  The Supreme Court noted that there was no contention in the case "that the hearing would

not be a full adversary proceeding."  Id. n.3.  This understanding was central to its holding,

reflected in the following language:  "Clearly, if the initial view of the facts based on the

evidence derived from nonadversarial processes as a practical or legal matter foreclosed fair and

effective consideration at a subsequent adversary hearing leading to ultimate decision, a

substantial due process question would be raised."  Id. at 58.  This solitary line from Larkin is the

proverbial tail that wags the dog.  Although the holding in Larkin asserted in conclusion that a

court might well determine from "the special facts and circumstances present in the case before it

that the risk of unfairness is intolerably high," the Larkin case was addressed to the existence of

bias on the part of an "ultimate" decision maker, rather than an initial decisionmaker.  Larkin is,

therefore, an uncertain guide where evidence of bias calls into question the fairness of a

decisionmaker whose participation is limited to the kind of predeprivation proceeding more

recently condoned in Loudermill, especially when there is a postdeprivation administrative

27

hearing available and the record does not demonstrate anything that would "foreclose[] fair and effective consideration" on the part of the "ultimate" decisionmaker.  Id.

Shortly after deciding Larkin, the Supreme Court addressed the matter of bias again in Hortonville Joint School District v. Hortonville Educational Association, 426 U.S. 482 (1976). In Hortonville, the Supreme Court "granted certiorari . . . to determine whether School Board members, vested by state law with the power to employ and dismiss teachers, could, consistent with the Due Process Clause of the Fourteenth Amendment, dismiss teachers engaged in a strike prohibited by state law."  Id. at 483-84.  The genesis of the dispute was a failed collective-bargaining process between an association of teachers and a seven-member school board.  Id. at 484.  Some teachers went on strike and refused to return to work as ordered, in violation of state law, and the board decided to conduct disciplinary proceedings against them *en masse*.  Id.  The board voted to terminate holdout teachers and advised them of that fact in a letter that included an invitation to reapply for teaching positions.  Id. at 485.  The state trial court granted summary judgment to the board on the ensuing due process claim, but the Wisconsin Supreme Court reversed, on federal due process grounds, holding that the board could not serve as the final decisionmaker concerning the question of discipline because it was not impartial, having been a party to the negotiations that resulted in the strike.  Id. at 486.  The state court's underlying decision reflects that the board was the statutorily-appointed *final* decisionmaker with respect to teacher employment.  Hortonville Educ. Ass'n v. Hortonville Joint Sch. Dist., 225 N.W.2d 658, 673 (Wis. 1975).  The state court's solution was to mandate that review take place in a state court with *de novo* authority to consider whether "another course of action such as mediation, injunction, continued collective bargaining or arbitration would have been a more reasonable response on the part of the decision maker."  Id. at 672.  The United States Supreme Court

reversed this federal due process determination.  The Court concluded that the board was not disqualified from serving as the final administrative decisionmaker based on their prior involvement in the collective-bargaining dispute.  426 U.S. at 492-94, 97.  The Court reasoned that "[t]he Fourteenth Amendment permits a court to strip the Board of the [power to terminate teacher employment] only if the Board's prior involvement in negotiating with the teachers means that it cannot act consistently with due process."  Id. at 494.  The Court did not address what would be necessary to prove an inability on the part of a state-appointed administrative body to satisfy due process requirements.  Like Larkin, the significance of Hortonville is somewhat uncertain, for present purposes, because the tribunal in question was the ultimate decision-making body, not merely a predeprivation decisionmaker.[12]  However, both opinions reflect that an appreciable measure of inherent bias is acceptable even on the part of the final, or "ultimate," decisionmaker.

In the instant case the ultimate decisionmaker is the Commissioner of Education, who did not preside over the underlying investigation and discharge proceeding.  Moreover, state law provides the Commissioner with the authority to afford a discharged superintendent with a full-blown postdeprivation administrative hearing.  Cf. 20-A M.R.S. § 1052(3) ("The commissioner shall hold a hearing as part of the appeal.");  see also Me. Sch. Admin. Dist. 63 v. Comm'r of the Dep't of Educ., No. AP-08-77 (Me. Sup. Ct. Jan. 21, 2009) (Doc. 92).[13]  Although I have not

---

[12]      There is a slightly dissonant tone in Hortonville in relation to cases such as the instant case because the Supreme Court characterized the Hortonville school district board as addressing matters of public policy to which the disciplinary decision was "only incidental."  426 U.S. at 495.  It is uncertain how policy and discipline can be neatly separated even in ordinary disputes over public employment.

[13]      In Justice Jabar's words:

Title 20-A M.R.S. § 1052(3) states that the Superintendent may appeal a school board's decision to the Commissioner and the Commissioner shall hold a hearing as part of the appeal.  A hearing under this section necessarily includes a right to present evidence and examine witnesses.  The language contained in Title 20-A M.R.S. § 1052(3) uses the term "hearing" rather than

attempted to canvass all of the cases cited in <u>Larkin</u> and <u>Hortonville</u> as exemplars of unconstitutional bias, it appears that they prohibit state process that permits someone with bias from serving as the final decision-making authority on questions of fact and punishment.  <u>See,</u> <u>e.g.</u>, <u>Taylor v. Hayes</u>, 418 U.S. 488, 503 (1974) (prohibiting final contempt disposition and sentence of imprisonment by judge who initially charged petitioner with contempt where "marked personal feelings were present on both sides" and "unseemly conduct [had] left personal stings"); <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927) (invalidating trial-by-mayor related to Prohibition, where the law gave one-half of any fine to the municipal body whose officer heard the case); <u>see</u> <u>also</u> <u>Pickering v. Board of Educ.</u>, 391 U.S. 563, 578 n.2 (1968) (critiquing absence of any *de novo* fact finding by impartial body at the state level, such as by a state court, so that the administrative "trier of fact was the same body that was [ ] both the victim of appellant's statements and the prosecutor that brought the charges aimed at securing his dismissal").  In all of these proceedings the final state appellate process deferred to the findings of the initial decisionmaker, meaning that the biased decisionmakers were the ultimate decisionmakers on questions of fact and discipline and the reviewing bodies had only limited review authority.  That is not the case here.

Since <u>Hortonville</u> and <u>Larkin</u> there has been an abundance of judicial consideration of the extent to which state postdeprivation process is sufficient to resolve claims of due process violations arising from predeprivation process or the denial of predeprivation process.  I do not

---

"adjudicatory hearing" but so does in the language contained in the Maine Administrative Procedures Act, Title 5, §§ 952 and 952-A.  They all use the term "hearing" rather than "adjudicatory hearing."  They mean the same thing.  Although section 1052(3) does not define "hearing" as an adjudicatory hearing under Title 5, most authorities equate the term "hearing" with a proceeding where evidence is admitted and witnesses are examined.

(Doc. 92 at 2-3.)

attempt to describe that development here.  For present purposes it appears sufficient to say that

the First Circuit Court of Appeals has concluded that, so long as state law establishes an

appropriate predeprivation procedure, the intentional subversion of that procedure by individual

members of the board is a species of random and unauthorized conduct that, where possible,

must be remedied through postdeprivation process rather than a federal § 1983 claim.  Cronin v.

Town of Amesbury, 81 F.3d 257, 260 & n.2 (1st Cir. 1996) (per curiam) (involving claims "that

the Town defendants were out to get [plaintiff]").  If adequate postdeprivation process is

available to redress the individual defendants' alleged malfeasance or prejudice, then "no claim

of procedural due process can be brought under § 1983."  Id. at 260 (quoting Lowe v. Scott, 959

F.2d 323, 340-41 (1st Cir. 1992));  see also Hadfield v. McDonough, 407 F.3d 11, 20 (1st Cir.

2005) (explaining that claims arising from flaws in official conduct rather than state procedural

requirements turn on the adequacy of postdeprivation process).  After all, "when a state official is

not acting pursuant to established state procedure, the state is not in a position to provide

anything other than such postdeprivation remedies."  Lowe, 959 F.2d at 340.

    This rationale is also demonstrated in Chmielinski, where the First Circuit noted that a

claim of bias would fail, "in any event," where there was no allegation that the postdeprivation

decisionmaker was biased and postdeprivation procedures were adequate.  513 F.3d 309, 318 n.

6 (1st Cir. 2008).  Counsel for Regan argued most stridently at oral argument that this footnote

from Chmielinski has no application in this case because it requires a predicate finding that the

applicable state law required an unbiased decisionmaker.  See id. ("*If* there were a requirement of

an unbiased decisionmaker under state law, the plaintiff would have an argument that [the

hearing officer's] purported bias was a random and unauthorized act.") (emphasis added).

However, this is not such a clear distinction.  Maine law may permit an employer with inherent

bias to preside over an investigation and a predeprivation hearing on superintendent discharge, but it also (1) conditions discharge on cause (which is antithetical to discharge based on personal animosity), 20-A M.R.S. § 1052(1)(A), and (2) requires that a different decisionmaker, the Commissioner, preside over an appeal that must entail a further hearing, id. § 1052(3).  Thus, it cannot fairly be said that Maine law condones a scenario in which the person invested with ultimate fact-finding and disciplinary authority over superintendent discharge is someone infected with the kind of personal animosity and bias that Regan says was present in a majority of the SAD 63 Board.  Chmielinski, therefore, does not rule out an application of the Cronin and Hadfield rationale to a case like this one.  Indeed, in Chmielinski, the Court noted that the claim in question would fail "in any event" even though the postdeprivation hearing officers had only limited review authority and the employer was able to preside at the predeprivation hearing.  513 F.3d at 317 n.6.  This aspect of Chmielinski—the lack of de novo review on the part of unbiased, postdeprivation administrative hearing officers—actually makes Chmielinski a more extreme case than what is proposed in this recommendation.

The application of the Cronin and Hadfield rationale extends not only to Regan's allegation of bias, but also to her allegation that the entire proceedings were illegitimate on account of an erroneous conclusion by the Board concerning its authority to terminate her employment without participation by the CSD 8 Board in a joint board meeting.  If the SAD 63 Board's determination as to its legal authority was erroneous, then that mistake of law, whether intentional or negligent, was unauthorized conduct, per se, and therefore falls squarely within the rule.  Hadfield, 407 F.3d at 20 ("Our cases establish that a government official has committed a random and unauthorized act when he or she misapplies state law to deny an individual the process due under a correct application of state law.  In other words, conduct is 'random and

unauthorized' within the meaning of Parratt-Hudson when the challenged state action is a flaw in the official's conduct rather than a flaw in the state law itself.") (citing Cronin, 81 F.3d at 260, among other circuit precedent).  Moreover, the question of the Board's legal authority to act also falls within the ambit of the Commissioner's plenary review authority.  If necessary, the state court system can expeditiously resolve that discrete legal question in further review proceedings.

Finally, it is important to reiterate that the disposition I am recommending to the Court does not necessarily require the Court to embrace a controversial application of the Parratt-Hudson[14] doctrine.  As an alternative to applying the Cronin rationale, the Court may simply find that the process called for under 20-A M.R.S. § 1052 satisfies due process precisely because it affords a more meaningful postdeprivation hearing that can cure any harm arising from predeprivation bias.  Inherent in the logic of Loudermill, in which the Supreme Court condoned a limited predeprivation process that dispenses with important attributes of the adversary process, is the idea that the state will ultimately afford a more elaborate hearing before a postdeprivation hearing authority whenever it has authorized the bare-minimum, predeprivation process described in Loudermill.  In this case, Regan fails to demonstrate that the State of Maine will not afford her an adequate postdeprivation administrative hearing before the Commissioner and all appearances are to the contrary.  The statute that governs the discharge of superintendents flatly provides for an appeal before the Commissioner of Education and, moreover, provides that the Commissioner "shall hold a hearing as part of the appeal."  20-A M.R.S. § 1052.[15]  This hearing

---

[14]    Hudson v. Palmer, 468 U.S. 517 (1984);  Parratt v. Taylor, 451 U.S. 527 (1981).

[15]    Regan's point at oral argument was that this case is on "all fours" with Chmielinski and that, therefore, the Court must address the federal due process claim now, based on the adequacy of the pretermination hearing, as the Court of Appeals did in part II.B.2 of the Chmielinski opinion.  This case is clearly not on all fours with Chmielinski because the process in Chmielinski was "front loaded," with a two-day, adversarial, evidentiary hearing before the predeprivation hearing officer and all subsequent process was limited to oral or written briefing based on the record

should ensure that the Board's determination of disputed issues of fact and discipline will not be the ultimate determination. Under all of the available precedent discussed above, even if there exists sufficient evidence to support a finding that SAD 63's decision was poisoned by personal bias on the part of certain board members, a postdeprivation administrative hearing in which the Commissioner makes *de novo* findings on disputed factual matters and discipline will satisfy due process requirements.[16]

I therefore recommend that the Court grant the Defendants' Motion for Summary Judgment against the § 1983 claim so that, hopefully, the state process can run its course without much further ado.

## B.    State Law Claims

In her first and second counts, Regan asserts that the Defendants violated Maine's Freedom of Access Act, 1 M.R.S. §§ 401-412, and the Superintendent Discharge Statute, 20-A M.R.S. § 1052, by not publicly voting and providing her with a right to tell her side of the story *before* the Board could convene an investigation related to her potential discharge under 20-A

---

developed below. 513 F.3d at 312-13. <u>Chmielinski</u> process, in other words, was more akin to the process afforded in both <u>Larkin</u> and <u>Hortonville</u> than in <u>Loudermill</u>. This was a different process than what is contemplated in 20-A M.R.S. § 1052, which affords only minimum <u>Loudermill</u> process predeprivation, but affords a more elaborate hearing postdeprivation. Consequently, where the <u>Chmielinski</u> Court states that it "do[es] not think the issue of bias can be addressed with an abstract broad statement that the due process standard of <u>Loudermill</u> either always or never requires that the hearing officer be unbiased," and that bias may be "so severe as to interfere with due process at the hearing itself," it begs the question in a case like this:  "which hearing officer and which hearing?"  Contrary to Regan's position, <u>Chmielinski</u> does not box this Court into making a legal determination about the relative seriousness of the summary judgment evidence of the SAD 63 Board's bias, precisely because the process at issue in this case affords a subsequent hearing before an unbiased hearing officer with fact-finding and disciplinary discretion, not merely a deferential review based on the record developed by the Board.

[16]    Regan asserts as a material fact that the Commissioner took a phone call from board members Clark and Goodrich concerning the dispute.  It is not clear from her paper submissions, however, whether she means to suggest that the Commissioner is biased against her.  During oral argument, Attorney Zmistowski did not contest statements offered by Attorney Dench or me to the effect that there is no reason to infer bias on the part of the Commissioner. In any event, the phone call described in the record is simply not a sufficient evidentiary basis to support a finding that the Commissioner is infected with personal bias or animosity against Regan and cannot afford her a fair postdeprivation hearing.

M.R.S. § 1052.  Based on <u>Loudermill</u>, already discussed, I reject Regan's assertion that these alleged failures would implicate the Due Process Clause of the Fourteenth Amendment because Regan was provided with pretermination notice of the charges against her and an opportunity to address the Board concerning those charges prior to the vote that terminated her employment.  In addition, Regan seeks a declaration that the SAD 63 Board did not have the authority to convene an investigation or proceed with a predeprivation hearing unless it did so in conjunction with the CSD 8 Board.  Based on <u>Cronin</u>, I conclude that due process has not yet run its course at the state level with regard to the authority question.  These claims and the itemized pleas for declaratory, injunctive, and equitable relief that go with them raise questions of state process that are better decided in a state forum.  Regan's third count alleges a violation of her right to review her personnel file and is brought pursuant to 26 M.R.S. § 631.  Regan's fourth and fifth counts allege breach of contract and tortious interference with her contract.  Her seventh count is a claim of defamation advanced under the Maine Tort Claims Act, 14 M.R.S. §§ 8101-8118.  In addition to these claims, the newly operative Fourth Amended Complaint adds two counts falling under the aegis of the Maine Human Rights Act.  Regan has filed a cross-motion for summary judgment on an issue pertaining to her allegation that the SAD 63 Board failed to provide her with a copy of her personnel file, in violation of state law (Doc. 55 at 12.)

"Ordinarily, when a court grants summary judgment in a defendant's favor on all federal claims, it should simply dismiss any pendent state claims to allow the plaintiff to refile them in state court."  <u>Learnard v. Inhabitants of Van Buren</u>, 182 F. Supp. 2d 115, 126 (D. Me. 2002).  As the Court observed in <u>Learnard</u>, the "contours" of the pending state law claims "are better outlined in state court."  <u>Id.</u> at 128.  I therefore recommend that the Court decline to exercise

supplemental jurisdiction over the state law claims and remand them to the Maine Superior

Court.  If the Court agrees, Plaintiff's Cross-Motion for Summary Judgment is rendered moot.

### CONCLUSION

For the reasons set out above, I RECOMMEND that the Court GRANT Defendants'

Motion for Summary Judgment (Doc. 35), IN PART, by entering judgment for Defendants on

Count VI, the solitary federal claim;  enter an order remanding the remaining state law issues and

claims to the Maine Superior Court;  and MOOT Plaintiff's Cross-Motion for Partial Summary

Judgment (Docs. 55, 79.)

### NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, and request for oral argument before the
district judge, if any is sought, within ten (10) days of being served with a copy
thereof.  A responsive memorandum and any request for oral argument before the
district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

May 12, 2009